1  **WO**

2

3

4

5

6  **IN THE UNITED STATES DISTRICT COURT**

7  **FOR THE DISTRICT OF ARIZONA**

8

9  AGA Shareholders, LLC, an Illinois          )     No. CV-07-62-PHX-DGC
   Limited Liability Company,                  )
10                                             )     **ORDER**
                         Plaintiff,            )
11                                             )
   vs.                                         )
12                                             )
   CSK Auto, Inc., an Arizona corporation;     )
13 Maynard L. Jenkins; Martin G. Fraser;       )
   and Donald W. Watson,                       )
14                                             )
                         Defendants.           )
15 _____    )

16         American Generator & Armature Company ("American Generator") was in the

17 business of producing remanufactured automotive starters and alternators.  CSK Auto, Inc.

18 ("CSK") owns and operates a national chain of more than 1,000 retail stores that sell

19 automotive parts and supplies.  In December 1999, American Generator and CSK entered

20 into a business relationship in which American Generator agreed to sell products to CSK

21 pursuant to the terms of a Master Vendor Agreement ("MVA").  CSK began purchasing

22 original equipment quality alternators and starters ("OE Quality Products") from American

23 Generator in January 2000.  The business relationship ended in March 2004.  American

24 Generator is no longer in business.

25 **I.      This Suit.**

26         American Generator assigned its claims to Plaintiff AGA Shareholders, LLC. The

27 Court will therefore use the term "AGA" throughout this order to refer to both AGA

28 Shareholders and American Generator.  In February 2006, AGA filed a complaint against

1    CSK in the Northern District of Illinois. The complaint alleged that on April 11, 2003, AGA

2    and CSK entered into a contract (the "Agreement") to conduct business for a term of five

3    years, but that CSK terminated the Agreement in January 2004 and ceased doing business

4    with AGA two months later. Dkt. #38-4. The case was transferred to this Court in January

5    2007. Dkt. #38. AGA filed an amended complaint naming as additional defendants

6    Maynard Jenkins, Martin Fraser, and Don Watson, former officers of CSK (collectively

7    "Individual Defendants"). The amended complaint alleges that the Individual Defendants

8    caused CSK to terminate the Agreement and sign a supply contract with Unit Parts Company

9    ("Unit Parts"). The amended complaint asserts eight claims: breach of written contract,

10   breach of oral contract, breach of the implied covenant of good faith and fair dealing, breach

11   of contract for specially manufactured goods, breach of contract for failure to pay for

12   products sold and delivered, tortious interference with contract, civil conspiracy, and aiding

13   and abetting. Dkt. #68.

14        All parties have filed motions for summary judgment. AGA seeks summary judgment

15   as to CSK's liability on counts one and five. Dkt. #210. CSK seeks summary judgment on

16   counts one through five. Dkt. #212. The Individual Defendants seek summary judgment on

17   counts six through eight. Dkt. ##163, 181, 186. CSK and Jenkins have also filed motions

18   to strike AGA's expert witnesses. Dkt. ##214, 215. The motions have been fully briefed.

19        For reasons stated below, the Court will grant in part and deny in part AGA's and

20   CSK's motions for summary judgment, grant the Individual Defendants' motions for

21   summary judgment, and deny the motions to strike. The Court will deny the requests for oral

22   argument because the parties have thoroughly briefed the law and evidence and oral

23   argument will not aid the Court's decision. *See Mahon v. Credit Bur. of Placer County, Inc.*,

24   171 F.3d 1197, 1200 (9th Cir. 1999).[1]

25

26

27   _____

[1]AGA's papers do not comply with the font-size requirements of LRCiv 7.1(b)(1). AGA

28   shall comply with all local rules in future filings.

1    **II.      Summary Judgment Standard.**

2          A party seeking summary judgment "always bears the initial responsibility of

3    informing the district court of the basis for its motion, and identifying those portions of

4    [the record] which it believes demonstrate the absence of a genuine issue of material fact."

5    *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  Summary judgment is appropriate if the

6    evidence, viewed in the light most favorable to the nonmoving party, shows "that there is no

7    genuine issue as to any material fact and that the movant is entitled to judgment as a matter

8    of law."  Fed. R. Civ. P. 56(c).  Only disputes over facts that might affect the outcome of the

9    suit will preclude the entry of summary judgment, and the disputed evidence must be "such

10   that a reasonable jury could return a verdict for the nonmoving party."  *Anderson v. Liberty*

11   *Lobby, Inc.*, 477 U.S. 242, 248 (1986).

12   **III.     Count One – Breach of Written Contract.**

13         AGA alleges in count one that CSK breached the Agreement by refusing to purchase

14   OE Quality Products from AGA from March 4, 2004 through April 10, 2008.  Dkt. #68

15   ¶¶ 25-26.  Before addressing the parties' summary judgment arguments, a brief overview of

16   supply contracts is necessary.

17         Supply contracts "fall into one of three categories:  definite quantity, indefinite

18   quantity, and requirements."  *In re Anchor Glass Container Corp.*, 297 B.R. 887, 890 (Bankr.

19   M.D. Fla. 2003).  A definite quantity contract is "a contract for the buyer to buy a specific

20   amount of product for a specific amount of money."  *Id.* at 890-91.  Under an indefinite

21   quantity contract, "'the buyer agrees to purchase and the seller agrees to supply whatever

22   quantity of goods the buyer chooses to purchase from the seller.'"  *Id.* at 892 (citation

23   omitted).  A requirements contract "'obligates the buyer to buy all of its requirements for

24   goods of a particular kind from the seller.'"  *Id.* at 891 (citation omitted); *see* A.R.S. § 47-

25   2306(A).

26         AGA seeks summary judgment as to CSK's liability on count one on the ground that

27   both the terms of the Agreement and evidence regarding the parties' intent establish that the

28   Agreement constitutes a 5-year requirements contract.  Dkt. #210 at 4-10.  CSK contends that

1  count one fails as a matter of law because the Agreement lacks a quantity term indicating a
2  requirements obligation and therefore constitutes, at most, an indefinite quantity contract.
3  Dkt. #212 at 3-8.

4      A number of well-established principles guide the Court's interpretation of the
5  Agreement.  First, the Court must attempt to 'ascertain and give effect to the intention of the
6  parties at the time the contract was made[.]'"  *Taylor v. State Farm Mut. Auto. Ins. Co.*, 854
7  P.2d 1134, 1139 (Ariz. 1993) (en banc) (citation omitted).  Second, the Court must "apply
8  a standard of reasonableness to contract language" and construe the contract "in its entirety
9  and in such a way that every part is given effect."  *Goddard v. R.J. Reynolds Tobacco Co.*,
10  75 P.3d 1075, 1078 (Ariz. Ct. App. 2003) (citations and quotation marks omitted).  Third,
11  the Court must consider any relevant extrinsic evidence and, if "the contract language is
12  'reasonably susceptible' to the interpretation asserted by its proponent, the evidence is
13  admissible to determine the meaning intended by the parties."  *Taylor*, 854 P.2d at 1140
14  (citation omitted).  With these principles in mind, the Court will interpret the Agreement by
15  considering the language of the Agreement itself and evidence concerning the parties' intent,
16  including "negotiation, prior understandings, and subsequent conduct[.]"  *Id.* at 1139; *see*
17  *generally* Restatement (First) of Contracts § 235.

18      **A.**    **The Agreement.**

19      The Agreement arose from CSK's desire to install new testing equipment in its stores.
20  In January 2003, CSK's merchandise manager, Roger Weiss, sent a letter to AGA's director
21  of sales and marketing, Joseph Resnick, requesting that AGA pay 30% of the $4.5 million
22  it would cost to implement CSK's new testing program.  Dkt. ##211, 229 ¶¶ 55; Dkt. #211-
23  25 at 3.  Resnick responded by proposing that AGA and CSK enter into a comprehensive,
24  long-term contract.  Dkt. ##211, 229 ¶¶ 56-57.  Weiss asked Resnick to put a proposal in
25  writing.  *Id.* ¶¶ 60.  Resnick provided Weiss with several proposals, culminating in the
26  Agreement.  Dkt. ##221-4 at 31-33, 221-26, 221-27, 211-28 at 3-4.

27      The Agreement included several important components.  First, AGA agreed to help
28  pay for CSK's new testing program by increasing its discounts to CSK.  Second, the parties

1  agreed to update the AGA products in CSK stores.  Third, AGA agreed to an annual

2  incentive credit designed to promote sales and reduce warranty returns by CSK's customers.

3  Finally, the Agreement set forth a "commitment to a 5-Year Term contract[.]" Dkt. #211-28.

4  The last paragraph of the Agreement states:

5      With AGA's partnership and commitment to continually service CSK's 3-year
        product line at the highest level of quality and service, and to commit to
6      investing in financial endeavors sought to improve the category, we
        respectfully seek CSK's commitment to AGA in doing business for a 5-year
7      term, to begin upon the date of signature of this agreement by representatives
        of CSK and AGA[.]

8

9  *Id*. Weiss, acting on behalf of CSK, and Resnick, acting on behalf of AGA, signed the

10  Agreement on April 11, 2003. *Id*.

11      **B.    Evidence of the Parties' Intent.**

12      It is undisputed that as early as August 2000, and on multiple occasions thereafter,

13  AGA sought CSK's binding commitment to purchase all of its requirements for OE Quality

14  Products from AGA. Dkt. ##211, 229 ¶¶ 58; Dkt. ##211-13, 211-29 at 15. With respect to

15  the Agreement itself, Resnick specifically told Weiss that AGA's goal in the negotiation was

16  to obtain a binding commitment from CSK to purchase from AGA all of CSK's requirements

17  for OE Quality Products. Dkt. ##68 ¶ 43, 72 ¶ 15; Dkt. #211-4 ¶ 24. Weiss has testified that

18  it was his and CSK's intention that CSK would purchase all of its OE Quality Products from

19  AGA during the term of the Agreement. Dkt. ##211, 229 ¶¶ 72; Dkt. #211-29 at 22. And

20  AGA actually served as CSK's exclusive supplier of OE Quality Products from January

21  2003, when CSK approached AGA about helping pay the costs of its new testing system,

22  until Unit Parts took over as CSK's exclusive supplier in March 2004. Dkt. ##225-20 at 16,

23  225-27 at 8. Thus, when the Agreement was signed the parties were operating in a

24  requirements relationship, with AGA acting as CSK's sole supplier for the relevant parts.

25      **C.    The Agreement Constitutes a 5-Year Requirements Contract.**

26      The Agreement must be interpreted "so as to make it effective and reasonable."

27  *Phelps Dodge Corp. v. Brown*, 540 P.2d 651, 653 (Ariz. 1975). Having read the Agreement

28  as a whole, and having considered evidence concerning the parties' intent, the Court

1    concludes that the only reasonable interpretation of the Agreement is that it constitutes a

2    5-year requirements contract.  The undisputed evidence clearly shows that AGA, which was

3    then CSK's exclusive supplier of OE Quality Products, sought to become CSK's exclusive

4    supplier for a specified period of five years.  AGA expressed this goal in the Agreement by

5    seeking "CSK's commitment to AGA in doing business for a 5-year term" in return for

6    AGA's promise to pay $1.35 million to help cover the costs of CSK's new testing system and

7    to "continually service CSK's 3-year product line at the highest level of quality and

8    service[.]" Dkt. ##211-28 at 3-4, 211-29 at 20-22.  Evidence of the parties' intent and course

9    of dealing, and CSK's explicit "commitment to AGA in doing business for a 5-year term,"

10   establish that the Agreement is a 5-year requirements contract.  *See Puritan Sys., Inc. v. M.G.*

11   *Indus., Inc.*, No. 18093, 1997 WL 775681, at \*4 (Ohio Ct. App. Oct. 29, 1997) (purchase

12   orders stating that the defendant would supply liquid nitrogen to the plaintiff were

13   requirements contracts because the purchase orders also provided "a definite time frame to

14   the agreement"); A.R.S. § 47-1303(D) ("A course of performance or course of dealing

15   between the parties . . . is relevant in ascertaining the meaning of the parties' agreement [and]

16   may give particular meaning to specific terms of the agreement[.]").

17       **D.    CSK's Arguments.**

18       CSK makes several arguments as to why the Agreement is not a binding five-year

19   requirements contract.  The Court will address them individually.

20       **1.    CSK's Intent.**

21       CSK does not dispute that it was Weiss's and CSK's intention that CSK would

22   purchase all of its OE Quality Products from AGA during the term of the Agreement.  *See*

23   Dkt. ##211, 229 ¶¶ 72; Dkt. #211-29 at 22.  CSK asserts, however, that this significant fact

24   is irrelevant because it was never disclosed to AGA. Dkt. #231 at 5.  But evidence of CSK's

25   intent at the time the Agreement was executed is clearly relevant to the meaning of the

26   Agreement, particularly when it squares completely with AGA's intent.  In interpreting the

27   Agreement, the Court must "attempt to 'ascertain and give effect to the intention of the

28   parties at the time the contract was made if at all possible.'"  *Taylor*, 854 P.2d at 1139

1   (citation omitted); *see also Malad, Inc. v. Miller*, --- P.3d ---, 2008 WL 2612094, at 4 (Ariz.

2   Ct. App. July 3, 2008) ("We interpret a contract based on the parties' intent upon entering

3   the agreement[.]").  Moreover, the fact that CSK signed the Agreement while the parties were

4   in a requirements relationship and after AGA had clearly requested a five-year extension of

5   that relationship, and then proceeded to purchase its requirements from AGA, clearly

6   communicated CSK's intent to AGA.

7                           **2.      CSK's Agreement to be Bound.**

8            CSK asserts that AGA has not shown that CSK agreed to be bound to that intention.

9   Dkt. #229 ¶ 72.  This too is incorrect.  The Agreement provides that "CSK's commitment to

10  AGA in doing business for a 5-year term" was to "begin upon the date of signature of this

11  [A]greement by representatives of CSK and AGA[.]"  Dkt. #211-28 at 4.  Weiss signed the

12  Agreement as the "CSK Representative" on April 11, 2003 (*see id.*), and CSK purchased all

13  of its OE Quality Products from AGA after that date until CSK terminated its relationship

14  with AGA.  *See* Dkt. ##225-20 at 16, 225-27 at 8; *see also Koenen v. Royal Buick Co.*, 783

15  P.2d 822, 826 (Ariz. Ct. App. 1989) (purchase order binding on seller once it was signed by

16  a sales manager).  CSK's conduct following execution of the Agreement shows that it agreed

17  to bound to the parties' intent.  *See* Restatement (First) of Contracts § 235(e) ("If the conduct

18  of the parties subsequent to a manifestation of intention indicates that all parties placed a

19  particular interpretation upon it, that meaning is adopted if a reasonable person could attach

20  it to the manifestation."); *Duhame v. Navopache Elec. Coop., Inc.*, 488 P.2d 184, 187 (Ariz.

21  Ct. App. 1971) ("conduct of the parties subsequent to execution of the contract indicates the

22  interpretation placed upon the contract").

23                          **3.      Statute of Frauds.**

24           CSK argues that the Agreement does not satisfy the statute of frauds because neither

25  the term "requirements" nor the term "exclusive" appears in the Agreement and nothing in

26  the Agreement speaks to quantity.  Dkt. ##212 at 4-8, 228 at 3-4, 231 at 24.  Arizona's statute

27  of frauds, codified at A.R.S. § 47-2201, is identical to section 2-201 of the Uniform

28  Commercial Code ("UCC").  *See Koenen*, 783 P.2d at 826.  It provides that a contract "is not

enforceable . . . beyond the quantity of goods shown in such writing." A.R.S. § 47-2201(A). Courts have interpreted this UCC provision to mean that "[i]n order for a writing to satisfy the statute of frauds, it need only state one term – the quantity of goods involved." *Puritan*, 1997 WL 775681, at *4.  This element of the statute of frauds becomes problematic, of course, when a requirements contract is at issue.  Such a contract by its very nature does not specify a quantity of goods to be purchased.  Courts therefore have held that "[w]hile the quantity term in requirements contracts need not be numerically stated, there must be some writing which indicates that the quantity to be delivered under the contract is a party's requirements[.]" *Merritt-Campbell, Inc. v. RxP Prods., Inc.*, 164 F.3d 957, 963 (5th Cir. 1999).

Courts have been somewhat liberal in applying this requirement.  They have made clear that "no special language is necessary to create a requirement contract." *Porous Media Corp. v. Midland Brake, Inc.*, 220 F.3d 954, 960 (8th Cir. 2000).  They have noted that requirements contracts cannot state a fixed quantity, but should suggest "that one party will fill all of its requirements exclusively with the other party." *Puritan Sys.*,1997 WL 7775681, at *4.  Courts have found this requirement satisfied when a purchase order merely stated that the vendor would "supply" liquid nitrogen for two years, *id.*, or when the contract mentioned the circumstances under which the buyer could "resource" goods from other vendors, *Porous*, 220 F.3d at 960.

In determining whether a "requirements" intent has been sufficiently expressed in the language of the Agreement, the Court finds particularly relevant the statute of frauds commentary to UCC §§ 2-201 and 2-202 – sections adopted verbatim in A.R.S. §§ 47-2201 and 47-2202.  That commentary, while recognizing the quantity requirement, states that "[t]he required writing need not contain all the material terms of the contract *and such material terms as are stated need not be precisely stated.  All that is required is that the writing afford a basis for believing that the offered oral evidence rests on a real transaction*." Comment, UCC § 2-201 (emphasis added); *see also* A.R.S. § 47-2201; *Koenen*, 783 P.2d at 826 (quoting Comment).  Furthermore, contracts "are to be read on the assumption that the

1    course of prior dealings between the parties and the usages of trade were taken for granted

2    when the document was phrased.  Unless carefully negated they have become an element of

3    the meaning of the words used."  Comment, UCC § 2-220.

4         As noted above, the Agreement was signed when AGA and CSK were in an exclusive

5    requirements relationship and AGA was agreeing to invest seven figures in CSK's testing

6    facilities.  The Agreement states that CSK, in return, was making a "commitment to AGA

7    to doing business for a 5-year term," that the term would begin when the Agreement was

8    signed, and that AGA would thereafter "continually service CSK's 3-year product line at the

9    highest level of quality and service."  Dkt. #211-28.  The parties' agreement to continue

10   "doing business" must read in light of how they were "doing business" at the time – in a

11   requirements relationship.     That course of dealing, according the statute of frauds

12   commentary, became "an element of the meaning of the words used."  Comment, UCC § 2-

13   220.  CSK's "commitment" to continue doing business with AGA "for a 5-year term," and

14   AGA's promise to "continually service" CSK's product needs, likewise reflects an intent to

15   continue the requirements relationship for a fixed term of years.  Thus, the language used in

16   the Agreement adequately reflects the requirements nature of the contract for purposes of the

17   statute of frauds – a commitment by CSK to continue their exclusive requirements

18   relationship for a period of five years, during which AGA would continually service CSK's

19   OE Quality Products needs.  This meaning is confirmed by the fact that the parties then

20   proceeded to do business in a requirements relationship, at least until CSK breached the

21   Agreement in 2004.  Indeed, "the course of actual performance by the parties is considered

22   the best indication of what they intended the writing to mean."  UCC Comment to § 2-202.

23   The Court finds that the Agreement satisfies the statute of frauds.

24              **4.    Waiver of the MVA Signature Requirement.**

25        CSK next contends that to the extent the Agreement can be interpreted as a

26   requirements contract, it is not a valid modification of the MVA. Dkt. ##228 at 5.  The MVA

27   is an indefinite quantity contract because it did not "require CSK to purchase any Product

28   from [AGA]."  Dkt. #211-3 at 6.  CSK asserts that the Agreement is not a valid modification

1  of the MVA because any modification had to be signed by the president or a vice-president

2  of CSK (*see id*), and the Agreement was signed by Weiss, a CSK merchandise manager.

3  Dkt. ##212 at 7-8, 228 at 5, 231 at 7-9.  AGA argues that CSK never demanded strict

4  compliance with the MVA's signature requirement during the parties' business

5  relationship and has therefore waived that requirement.  Dkt. ##226 at 8-9, 230 at 4.

6       Conduct "inconsistent with demanding strict compliance with the contract[] results

7  in a waiver of the . . . contract provisions." *Kammert Bros. Enters., Inc. v. Tanque Verde

8  Plaza Co.*, 428 P.2d 678, 682 (Ariz. 1967) (en banc); *see* A.R.S. § 47-2209(D).  The

9  undisputed evidence shows that CSK did waive strict compliance with the MVA's signature

10 requirement.  An addendum attached to the MVA, like the Agreement, was signed by a CSK

11 merchandise manager and not by the president or a vice president of CSK.  Dkt. #211-3

12 at 12; *see also* Dkt. ##225-12, 225-13.  Another addendum was not signed by CSK at all.

13 Dkt. #211-3 at 4-5.  CSK does not dispute the validity of these addenda, nor has CSK

14 presented evidence that it attempted to enforce the MVA signature requirement at any time

15 during its relationship with AGA.  *See Swerdlow v. Mallin*, 476 N.E.2d 464, 466-67 (Ill. Ct.

16 App. 1985) (defendants waived strict compliance with signature requirement provision where

17 they did not raise the issue until after learning that they could not perform the contract).  In

18 fact, CSK did not even sign the MVA, and yet contends that it constitutes a valid and

19 enforceable contract.  *See AGA Shareholders, LLC. v. CSK Auto, Inc.*, 467 F. Supp. 2d 834,

20 846 (N.D. Ill. 2006).  CSK cannot have it both ways – if cannot rely on the unsigned MVA

21 and accept the validity of the unsigned or manager-signed addenda to the MVA, and at the

22 same time contend that the Agreement was an invalid modification of the MVA because it

23 lacked the signature of an executive officer of the company.

24      CSK asserts that any waiver on its part was unilaterally retracted when it notified

25 AGA in January 2004 that it was stopping orders.  Dkt. #231 at 8-9.  But CSK admits that

26 it terminated AGA "because CSK received a better proposal for ongoing business from a

27 competing vendor" (Dkt. #213 ¶ 25), not because the Agreement was invalid for lack of an

28 executive signature.  The January 2004 notification simply cannot be construed as

1  "reasonable notification" to AGA that CSK had retracted its waiver and would demand strict

2  performance with the MVA's signature requirement.  *See* A.R.S. § 47-2209(E).

3     **E.     Count One Summary.**

4        The Court finds, as a matter of law based on undisputed facts, that the Agreement

5  constitutes a 5-year requirements contract.  CSK does not dispute that it ceased purchasing

6  products from AGA during the term of the Agreement.  The Court accordingly will grant

7  summary judgment in favor of AGA with respect to CSK's liability on count one.

8  **IV.   Count Two – Breach of Oral Contract.**

9        AGA alleges that in April 2003, Resnick and Weiss orally agreed to a 5-year

10  requirements contract.  Dkt. #68 ¶¶ 17, 33-39.  CSK argues that count two is barred by the

11  express terms of the MVA.  Dkt. #212 at 8-9.  AGA does not address this argument in its

12  response.  *See* Dkt. #226 at 10-11.

13        The MVA provides that "[n]othing contained herein shall require CSK to order any

14  Product from [AGA]."   Dkt. #211-3 at 6.   The MVA further provides that "[a]ny

15  modification or waiver of any term of the MVA must be in writing" and "[i]n no event shall

16  the MVA be construed as amended by any alleged oral agreement[.]"  *Id.* at 9.  AGA has

17  presented no evidence that CSK waived this provision of the MVA.  The alleged oral

18  requirements contract is therefore barred by the express terms of the MVA.  *See* A.R.S. § 47-

19  2209(B) ("A signed agreement which excludes modification or rescission except by a signed

20  writing cannot be otherwise modified or rescinded.").   The Court will grant CSK's motion

21  for summary judgment with respect to count two.

22  **V.    Count Three – Breach of Implied Covenant.**

23        AGA alleges in count three that CSK breached its implied covenant of good faith and

24  fair dealing by terminating the Agreement and ceasing to do business with AGA.  Dkt. #68

25  ¶¶ 53-55.  CSK contends that count three fails because the implied covenant cannot require

26  CSK to do business with AGA where the MVA expressly disclaimed any such obligation.

27  Dkt. #212 at 10.  As explained above, the Agreement constitutes both a 5-year requirements

28  contract and a valid modification to the MVA.  The Court will deny CSK's motion for

1  summary judgment with respect to count three.

2  **VI.     Count Four – Breach of Contract for Specially Manufactured Goods.**

3       In count four, AGA asserts a breach of contract claim based on the specially

4  manufactured goods exception to the statute of frauds.  Dkt. #68 ¶¶ 59-65.  This count may

5  not be necessary in light of the Court's conclusion that the Agreement satisfies the statute of

6  frauds, but CSK does not argue that this count should be dismissed as duplicative.

7       AGA alleges that it was left with more than 8,000 products specially manufactured

8  for CSK and was forced to sell them at a loss of more than $400,000.  *Id.* ¶¶ 60-64.  CSK

9  contends that count four fails as a matter of law because the products were marketable to

10  others with only minor alterations.  Dkt. #212 at 11.

11      An exception to the statute of frauds exists where "the goods are to be specially

12  manufactured for the buyer and are not suitable for sale to others in the ordinary course of

13  the seller's business[.]"  A.R.S. § 47-2201(C)(1).  If the seller "can, with slight alterations,

14  sell the goods, then they are not specially manufactured."  *R.M. Schultz & Assocs., Inc. v.*

15  *Nynex Computer Servs. Co.*, No. 93 C 386, 1994 WL 124884, at *6 (N.D. Ill. Apr. 11, 1994).

16  If, however, the seller "must make 'essential changes' to make the goods marketable to

17  others, then the specially manufactured exception to the statute of fraud applies."  *Id.*

18  (citation omitted).

19      AGA has presented evidence that every retailer of remanufactured alternators and

20  starters has unique product specifications and that all products AGA sold to CSK were

21  manufactured to meet the "CSK Premium Specifications" sheet, were labeled with a unique

22  sticker containing bar coding and identifying different CSK part numbers, and were packaged

23  in CSK packaging different from that of other AGA customers.  Dkt. #225-2 ¶¶ 4-12; *see*

24  Dkt. ##225-5, 225-6, 225-36 at 4.  This evidence is sufficient to create a triable issue as to

25  whether AGA "could make only 'slight,' as opposed to 'essential,' changes to make the

26  goods marketable to others."  *R.M. Schultz & Assocs.*, 1994 WL 124884, at *6.  The Court

27  will deny CSK's motion for summary judgment with respect to count four.

28  / / /

**VII.    Count Five – Breach of Contract for Products Sold and Delivered.**

    **A.    CSK's Motion for Summary Judgment.**

AGA alleges in count five that CSK has refused to pay for products purchased from AGA between December 19, 2003 and March 4, 2004. Dkt. #68 ¶ 68. CSK seeks summary judgment on count five on the ground that AGA failed to comply with the payment discrepancy provision of the MVA and thereby waived its right to sue for unpaid accounts. Dkt. #212 at 12-16.

Section 11 of the MVA sets forth the terms for "Payment Discrepancy Resolution" between the parties. Dkt. #211-3 at 8-9. A paragraph of that section deals exclusively with payment discrepancies upon termination of the business relationship:

> Upon written notification from CSK that it will no longer be placing any new orders with [AGA], or in the event of termination or cancellation of this MVA, [AGA] shall have 90 days to provide CSK with: (a) notice of any outstanding Payment Discrepancies; and (b) . . . copies of any open invoices, open credits and accounts receivable aging reports supporting any alleged unpaid balance. If [AGA] fails to raise Payment Discrepancies within the foregoing time period, [AGA] shall be deemed to have waived all claims for payment with respect to such matter.

*Id.* at 9. CSK notified AGA that it would no longer be placing any new orders on January 30, 2004. Dkt. #213 ¶¶ 23-24. AGA was therefore required to provide CSK with notice of payment discrepancies by April 30, 2004.

On March 29, 2004, Resnick sent a letter to Watson, CSK's senior vice president and chief financial officer, regarding possible settlement of all claims for CSK's alleged breach of the Agreement. Dkt. #225-36. The letter sets forth the amounts allegedly owed to AGA and now sought by AGA in this suit. *Compare* Dkt. #225-36 at 6 *with* Dkt. #68 at 29. The letter includes a spreadsheet identifying the amount of open invoices, open credits, and other relevant payment and credit information. Dkt. #225-36 at 5-16.

The Court concludes that the March 29 letter creates a genuine issue of fact as to whether AGA complied with the payment discrepancy provision of the MVA. The Court

1  will deny CSK's motion for summary judgment with respect to count five.[2]

2        **B.      AGA's Motion for Summary Judgment.**

3        AGA seeks summary judgment as to CSK's liability on count five on the ground that

4  it is undisputed that CSK improperly used unearned credits to pay for products it purchased

5  from AGA.  Dkt. #210 at 17.

6                **1.      The Core Bank.**

7          A central component of an alternator and starter is a core, which can be recycled

8  after the rest of the product becomes unusable.  A warranty product is an alternator or starter

9  returned to the retailer by a customer due to a product defect.  Retailers ship spent cores and

10  warranty products to remanufacturers who use them to build more alternators and starters.

11        Before it purchased any products from AGA, CSK shipped cores and warranty

12  products from its former vendor to AGA.  Dkt. ##211, 229 ¶¶ 11; *see* Dkt. ##211-4 ¶ 23,

13  211-8 at 55-56.  CSK received credits from AGA for those items and all other cores and

14  warranty products CSK shipped to AGA prior to the termination of the Agreement.  *Id.*

15  When CSK began purchasing products from AGA, CSK paid a deposit that would be

16  refunded when CSK returned cores to AGA.  Dkt. ##68 ¶ 79, 72 ¶ 28.

17        AGA contends that the parties agreed that CSK could apply credits for excess core

18  and warranty returns only to equivalent purchases, that credits associated with such excess

19  returns were placed in a "core bank" and were to be held there until an equivalent purchase

20  was made by CSK, that when the parties stopped doing business CSK had returned

21  significantly more cores and warrant products than the products it had purchased, and that

22  upon termination CSK improperly applied all excess credits in the core bank to the amount

23  it owed AGA.  Dkt. #210 at 10-14.  CSK argues, among other things, that AGA's evidence

24  does not prove that CSK applied credits in excess of its purchases and that, in any event,

25

26  ───────────────

27  [2]CSK does not dispute that the letter is admissible to show that AGA complied with the
MVA's payment discrepancy provision.  *See* Fed. R. Evid. 408(b) (evidence of settlement

28  offer is admissible for the purpose of "negating a contention of undue delay"); *Rhoades v.
Avon Prods., Inc.*, 504 F.3d 1151, 1161 (9th Cir. 2007) ("[S]tatements made in settlement
negotiations are only excludable under the circumstances protected by [Rule 408].").

1  CSK has presented evidence showing that it paid more in core deposits than it took in core

2  return credits.  Dkt. #228 at 11-13.

3      AGA has presented no documentary evidence, such as purchase orders, invoices, and

4  credit memos, to show that CSK applied all its core bank credits to the amount it owed AGA.

5  AGA instead relies exclusively on the following deposition testimony of CSK's manager of

6  the accounts payable department, Bobbi Smrtka:

7      Q.    So that means that CSK would not apply a credit it received from AGA
             for any trucks that it returned in excess of trucks shipped; is that
8            correct?

9      A.    Yes.

10     Q.    So that left CSK with a balance of credits that it could not apply; is that
             correct?
11
       A.    Yes.
12
       Q.    And upon termination of AGA, what happened to those outstanding
13           credits?

14     A.    We applied them to the balance.

15     Q.    What balance?

16     A.    To the balance that was outstanding at the time.

17     Q.    Even though CSK had not ordered the equivalent purchase for those
             credits?
18
       A.    That's correct.
19

20  Dkt. #211-14 at 13; *see* Dkt. #210 at 11 (citing Dkt. #211 ¶ 32).

21      CSK counters this testimony with an account analysis report purportedly showing that

22  it took about $86,000 less in credits for core returns than it was charged for core deposits.

23  Dkt. #45-2; *see* Dkt. #228 at 12-13 (citing Dkt. #229 ¶ 10).  AGA does not address this report

24  in its reply.  Rather, AGA states that it seeks only "a judgment affirming the terms of the core

25  and warranty return agreements between AGA and CSK" and that if "CSK can prove at trial

26  that it complied with the agreements and did not return more cores and warranties than

27  products it purchased[,] then AGA's damages would be nothing."  Dkt. #230 at 6.

28

1   AGA misplaces the burden of proof.  To obtain summary judgment on count five,

2   even a judgment limited solely to the issue of liability, AGA must prove that CSK breached

3   the alleged core bank agreements.  AGA has not met this burden.  CSK's account analysis

4   report – a document AGA has failed to rebut – creates a triable issue as to whether CSK

5   complied with the alleged core bank agreements.  The Court will deny AGA's motion for

6   summary judgment with respect to this issue.

### 2.    Post-Termination Warranty Returns.

8       The parties agreed that AGA would continue to supply CSK with OE Quality

9   Products for a transitional period following AGA's termination as a CSK vendor.  Dkt.

10  ##211, 229 ¶¶ 48.  AGA asserts that CSK breached an oral agreement not to return any

11  warranty products to AGA during this period and improperly used credits for post-

12  termination returns to offset monies owed to AGA.  Dkt. #210 at 15-17.  CSK contends that

13  AGA cannot prove that CSK agreed to stop taking credits for warranty returns.  Dkt. #228

14  at 13-14.

15      Resnick has testified that on January 30, 2004, he requested that CSK immediately

16  stop the shipment of warranty returns to AGA and "Huden agreed to advise CSK returns

17  personnel to cease sending returns to AGA."  Dkt. #211-4 ¶ 20.  On February 9, 2004,

18  Resnick sent Huden an e-mail stating that "[s]ince there is an approximate 3+ months worth

19  of excess returns at AGA, it makes common sense (and fairness) [that] the transitional phase

20  of supplying product to CSK is done **without receiving ANY returns**."  Dkt. #211-23 at 2

21  (emphasis in original).  CSK contends that this statement is inconsistent with an agreement

22  by CSK to stop sending warranty returns to AGA.  Dkt. #228 at 14.  CSK claims that if such

23  an agreement existed, Resnick surely would have mentioned it in his e-mail rather than

24  relying on a fairness argument.  *Id.*

25      The Court concludes that, even when construed in CSK's favor, Resnick's e-mail is

26  not inconsistent with his testimony that CSK agreed to stop sending warranty returns to

27  AGA.  Resnick's belief that fairness required that warranty products should no longer be

28  shipped to AGA does not undercut his testimony that such an agreement existed.  His sense

1   of fairness could easily have co-existed with the Agreement.  CSK has presented no other

2   evidence controverting Resnick's testimony.  The Court therefore concludes, as a matter of

3   undisputed fact, that CSK agreed to stop sending warranty returns to AGA during the

4   transitional period.  Because CSK does not dispute that AGA has been charged for warranty

5   returns made during the transitional period (*see* Dkt. ##211, 229 ¶¶ 54), the Court will grant

6   AGA's motion with respect to this issue.

7   **VIII.   Count Six – Tortious Interference with Contract.**

8        AGA alleges that the Individual Defendants caused CSK to terminate the Agreement

9   and sign a contract with Unit Parts so that CSK could receive credit for spent cores before

10  they were returned to the vendor.  Dkt. #68 ¶¶ 83-84.  The Individual Defendants then

11  allegedly issued false financial statements partially based on the inaccurate inventory figures

12  and profited by selling their CSK stock at artificially inflated prices.  *Id*. ¶¶ 73-75.

13       The elements of tortious interference with contract are (1) existence of a valid

14  contractual relationship, (2) knowledge of the relationship on the part of the defendant,

15  (3) intentional interference inducing or causing a breach, (4) resultant damage to the party

16  whose relationship has been disrupted, and (5) proof that the defendant acted improperly.

17  *See* Restatement (Second) of Torts § 766; *Antwerp Diamond Exch. of Am., Inc. v. Better Bus.*

18  *Bur. of Maricopa County, Inc.*, 637 P.2d 733, 740 (Ariz. 1981); *Wagenseller v. Scottsdale*

19  *Mem'l Hosp.*, 710 P.2d 1025, 1043 (Ariz. 1985).

20       The Individual Defendants argue that AGA cannot establish any of the requisite

21  elements of tortious interference.  Dkt. ##163 at 5, 181 at 11, 186 at 4.  The Court concludes

22  that AGA has failed to present evidence sufficient to create a genuine issue as to whether the

23  Individual Defendants intentionally interfered with the Agreement.  The Court accordingly

24  need not address the Individual Defendants' other arguments.

25       The undisputed evidence shows that Huden, CSK's buyer of remanufactured

26  alternators and starters, made the decision to terminate the Agreement.  In early January

27  2004, Huden advised Resnick that CSK had received a proposal from another vendor to

28  supply CSK's requirements for OE Quality Products.  Dkt. #68 ¶ 41.  Huden discussed the

possibility of replacing AGA as a vendor with his boss, Mike Thompson,  but Thompson was "not in the midst of those [negotiations]" because "negotiations tend to take place from the buyer to the vendor."  Dkt. #187-2 at 6, 11.  Huden has testified that having reviewed Unit Part's proposal, he made the decision to replace AGA with Unit Parts.  *Id.* at 4-5. Thompson also has testified that the final decision to switch vendors was Huden's.  *Id.* at 12; *see* Dkt. ##187, 200 ¶¶ 20-23, 28.  On January 30, 2004, Huden and Thompson informed Resnick that Unit Parts was taking over as CSK's supplier of OE Quality Products. Dkt. #202 ¶ 22.

AGA relies on Resnick's testimony that in January 2004, he was told by Huden and another CSK employee, Mike Abramovich, that CSK executives – including Jenkins, Watson, and Fraser – were involved in the decision to terminate AGA.  Dkt. ##175 at 6, 197 at 7, 199 at 7; *see* Dkt. ##177-4, 198-3, 202-5.  The Individual Defendants argue that this evidence is inadmissible hearsay.  Dkt. ##180 at 5-7, 206 at 8 & n.5, 216 at 7.  The Court agrees.

The only possible basis to admit these statements would be as non-hearsay admissions by a "party's agent or servant concerning a matter within the scope of the agency or employment, made during the existence of the relationship[.]"  Fed. R. Evid. 801(d)(2)(D). As the proponent of the statements, AGA has the burden of showing that the statements were made within the scope of an agency relationship between Huden and Abramovich on one hand, and the Individual Defendants on the other.  *See Lippay v. Christos*, 996 F.2d 1490, 1497 (3d Cir. 1993).  AGA has made no such showing.

"An 'agency relationship' is not created solely by the fact that the purported principal is a corporate officer."  *Boren v. Sable*, 887 F.2d 1032, 1039 (10th Cir. 1989).  Rather, "an agency relationship is established only where the party-opponent personally 'directed the declarant's work on *a continuing basis*.'"  *Lippay*, 996 F.2d at 1498 (quoting *Boren*, 887 F.2d at 1041) (emphasis in original; brackets deleted).  AGA has presented no evidence that the Individual Defendants personally directed, on a continuing basis, the work of Huden and

1    Abramovich.[3]  Nor has AGA presented evidence that the Individual Defendants directed

2    Huden and Abramovich to make the statements in furtherance of the alleged conspiracy

3    among the Individual Defendants.  *See In re Sunset Bay Assocs.*, 944 F.2d 1503, 1519 (9th

4    Cir. 1991); *see also* Fed. R. Civ. P. 801(d)(2)(E).  The Court concludes the Resnick's

5    testimony as to what Huden and Abramovich told him constitutes inadmissible hearsay that

6    may not be considered on summary judgment.  *See Beyene v. Coleman Sec. Servs., Inc.*, 854

7    F.2d 1179, 1181-82 (9th Cir. 1988).

8         AGA contends that there is a triable issue as to whether Watson was involved in the

9    decision to terminate AGA because Watson generally became involved when CSK changed

10   vendors and Huden has testified that he "probably" had discussions with Watson regarding

11   the "terms of the transition" from AGA to Unit Parts.  Dkt. #199 at 7-8; *see* Dkt. ##202-2 at

12   6-7, 202-9 at 6-7.  But this evidence is not inconsistent with the unequivocal testimony of

13   both Huden and Thompson that Huden made the decision to replace AGA.  The evidence

14   shows, at most, that Huden and Watson may have discussed aspects of the transition from

15   AGA to Unit Parts.

16        AGA asserts that there is a "likelihood" that Jenkins and Fraser interfered with the

17   Agreement because they were aware of its existence, knew that CSK sought to enter into a

18   new agreement providing for payment of cores, manipulated CSK's financial statements over

19   a several-year period, and sold CSK stock at artificially inflated prices.  Dkt. ##175 at 7-8,

20   197 at 9-10.  AGA essentially claims that a jury reasonably could infer interfering conduct

21   on the part of Jenkins and Fraser based on their purported knowledge of the Agreement and

22   alleged improper conduct relating to the sale of CSK stock.  But intentional interference is

23   a separate and essential element of AGA's tort claim that cannot be inferred so easily.

24        While there is no technical requirement as to the kind of conduct that may result in

25   interference with a contract, *see* Restatement § 766 cmt. k, AGA can survive summary

26   _____

27   [3]AGA has presented evidence that Jenkins was involved in CSK's merchandising department
     and the department reported directly to him.  Dkt. ##177-10 at 6-8, 177-11 at 3.  But this
28   does not show that Jenkins, as Chairman and CEO of CSK (Dkt. #177-10 at 6), personally
     supervised lower-level employees on a continuing basis.

judgment only by presenting at least some evidence of actual interference on the part of the Individual Defendants. *See Boatman v. Samaritan Health Servs., Inc.*, 812 P.2d 1025, 1029 (Ariz. Ct. App. 1990) (affirming summary judgment where there "simply was no action or inaction" by the defendant that could be construed as interference). "[T]he plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322. As the party asserting a tortious interference claim, AGA bears the burden of proof. Because AGA has presented no evidence of any actual interference by the Individual Defendants, it has failed to meet its summary judgment burden. The Court accordingly will grant the Individual Defendants' motions for summary judgment with respect to count six. *See Boatman*, 812 P.2d at 1029; *see also Schultz v. Kelly*, 188 F. Supp. 2d 38, 56-57 (D. Mass. 2002) (granting summary judgment where there was "no evidence that Defendants actually interfered with any contract or business relationship"); *West v. Brazos River Harbor Navigation Dist.*, 836 F. Supp. 1331, 1339-40 (S.D. Tex. 1993) (evidence that the defendant knew of the plaintiff's termination and harbored ill will toward him did not preclude summary judgment where the plaintiff presented no evidence that the defendant "actually interfered" with his employment contract).[4]

AGA claims that summary judgment is not appropriate because the Individual Defendants' credibility is suspect. Dkt. ##175 at 2, 197 at 2, 199 at 2. To survive summary judgment, however, AGA must "designate 'specific facts showing that there is a genuine issue for trial.'" *Celotex*, 477 U.S. at 324 (quoting Fed. R. Civ. P. 56(e)). "'If the most that can be hoped for is the discrediting of [D]efendants' denials at trial, no question of material

---

[4]AGA complains that counsel for the Individual Defendants and CSK thwarted AGA's discovery efforts on this claim, and that AGA did not have the resources to fight this obstruction. *See* Dkt. ##175 at 3, 197 at 4, 199 at 3. This argument is clearly erroneous. AGA could have raised the alleged obstruction with the Court through a simple phone call (*see* Case Management Order, Dkt. #63, § 6), but never did so.

1  facts is presented.'" *Fernandez v. China Ocean Shipping*, 312 F. Supp. 2d 369, 378

2  (E.D.N.Y. 2003) (citation omitted).  As the party with the burden of proof, AGA "cannot

3  avoid summary judgment by merely intoning the mantra 'credibility.'"  *Butcher Co. v.*

4  *Bouthot*, 124 F. Supp. 2d 750, 752 (D. Me. 2001).

5  **IX.    Counts Seven and Eight – Civil Conspiracy and Aiding and Abetting.**

6          In Arizona, both civil conspiracy and aiding and abetting are derivative torts for which

7  a plaintiff may recover only if it has adequately pled an independent primary tort.  *See*

8  *Rowland v. Union Hills Country Club*, 757 P.2d 101, 110 (Ariz. Ct. App. 1988) (civil

9  conspiracy); *Wells Fargo Bank v. Ariz. Laborers, Teamsters, & Cement Masons*, 38 P.3d 12,

10  23 (Ariz. 2002) (aiding and abetting).  AGA's claims for civil conspiracy and aiding and

11  abetting clearly derive from the tortious interference claim.  *See* Dkt. #68 ¶ 92 (the Individual

12  Defendants "met, joined together, planned, and conspired to induce CSK to terminate the

13  Agreement"); ¶ 104 (the Individual Defendants "substantially assisted or encouraged the

14  other or others in the achievement of the tort" of interference with contract).  Because the

15  tortious interference claim fails as a matter of law, the Court will grant summary judgment

16  on the derivative claims asserted in counts seven and eight.

17  **X.    The Motions to Strike.**

18          CSK and Jenkins have filed a motion to strike AGA's damages expert, Lee Gould.

19  Dkt. #214.  Because the Court will grant summary judgment on the claims asserted against

20  Jenkins, and because CSK has not sought summary judgment on the issue of damages (*see*

21  Dkt. #212), the Court will deny the motion to strike without prejudice.  CSK may raise

22  objections to Mr. Gould's opinions by filing a motion in limine prior to trial.

23          CSK and Jenkins also have filed a motion to strike AGA's industry standards expert,

24  Jeffrey Susbauer.  Dkt. #215.  Because the Court did not rely on Mr. Susbauer's opinion in

25  ruling on the summary judgment motions, the Court will deny the motion to strike as moot.

26          **IT IS ORDERED:**

27          1.    The motions for summary judgment filed by Plaintiff AGA Shareholders, LLC

28                and Defendant CSK Auto, Inc. (Dkt. ##210, 212) are **granted in part** and

**denied in part** as follows:

  a.  With respect to count one of AGA's amended complaint, summary judgment is **granted** in favor of AGA on CSK's liability for breach of the five-year requirements contract.

  b.  With respect to count two of AGA's amended complaint, summary judgment is **granted** in favor of CSK.

  c.  With respect to counts three and four of AGA's amended complaint, CSK's motion for summary judgment is **denied**.

  d.  With respect of count five of AGA's amended complaint, CSK's motion for summary judgment is **denied** and AGA's motion for summary judgment is **denied** with respect to the core bank credits but **granted** with respect to post-termination warranty returns.

2.  The motions for summary judgment filed by Defendants Maynard Jenkins, Martin Fraser, and Donald Watson (Dkt. ##163, 181, 186) are **granted**.

3.  The motions to strike filed by Defendants CSK Auto, Inc. and Maynard Jenkins (Dkt. ##214, 215) are **denied** without prejudice.

4.  The Court will schedule a final pretrial conference by separate order.

DATED this 21st day of November, 2008.

_____
David G. Campbell
United States District Judge